UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

 - against -

JEAN-PIERRE NEUHAUS and
ROLAND KAUFMANN,

    Defendants.

- - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT IN
SUPPPORT OF ARREST WARRANTS

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

 THOMAS McGUIRE, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

 Upon information and belief, there is probable cause to believe that in or about and between January 2012 and March 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants JEAN-PIERRE NEUHAUS and ROLAND KAUFMANN did knowingly and willfully conspire to (1) travel in interstate and foreign commerce and use the mail and facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment, and carrying on of unlawful activity, specifically, commercial bribery, in violation of New York Penal Law Sections 180.00, 180.05 and 20.00, and (2) thereafter perform and attempt to perform acts to promote, manage, establish, carry on and facilitate

the promotion, management, establishment, and carrying on of such unlawful activity, contrary to Title 18, United States Code, Section 1952(a)(3)(A), all in violation of Title 18, United States Code, Section 371.

The source of your deponent's information and the grounds for his belief are as follows:

## Introduction

1. I am an investigative law enforcement officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code.

2. I have been employed as a Special Agent of the Federal Bureau of Investigation (FBI) since 2003. I am currently assigned to the New York Division, where I am tasked with investigating securities fraud, wire fraud, and other white collar crimes. I am involved in numerous white collar and financial crime investigations and have received training in investigating financial crimes. I also work and consult with Special Agents regarding financial investigations on a daily basis.

3. The facts and information contained in this affidavit are based on my personal knowledge and observations; my review of recordings, documents, and other records obtained during this investigation, including but not limited to financial reports and

documents; information received directly from law enforcement officers and witnesses; and information gained through my training and experience.

4. This affidavit does not set forth all information known by me about this case and is being submitted solely for the purpose of providing sufficient information to establish probable cause to support an application for a criminal complaint and arrest warrant.

### RELEVANT ENTITIES AND INDIVIDUALS

5. Axius, Inc. is a company incorporated in Nevada with its principal offices in Dubai, United Arab Emirates. According to its website, it is a "Holding Company and Business Incubator" that develops promising businesses. Axius's shares are publicly traded under the ticker "AXIU" on the Over-the-Counter Bulletin Board. According to a recent SEC filing, Axius lost $624,459 in 2011 on revenues of $7,837, and its auditors have expressed "substantial doubt about the uncertainty regarding the Company's ability to continue as a going concern." This means, essentially, that the auditors are concerned that Axius may go bankrupt.

6. At all relevant times, ROLAND KAUFMANN was a foreign citizen residing abroad and the CEO of Axius. KAUFMANN or his confederates own or control substantially all of the shares of Axius.

7. At all relevant times, JEAN-PIERRE NEUHAUS was a finance professional residing abroad who arranged stock transactions.

## THE FRAUDULENT SCHEME

8. NEUHAUS and KAUFMANN have hired an undercover Special Agent (the "UC") with the Federal Bureau of Investigation ("FBI") who has posed as an individual who would assist them in defrauding investors in a stock scheme.[1] Because this is an undercover operation, no actual private investors have purchased or will purchase the shares that the defendants are fraudulently selling; all purchases have in fact been carried out by the government. However, the services that the undercover agent agreed to perform for the defendants are similar to services performed in schemes investigated by the FBI and other law enforcement agencies in the past.

9. The defendants have hired the UC to carry out a stock bribery scheme. KAUFMANN wishes to sell Axius stock he owns, and NEUHAUS is assisting him in doing so. They agreed to bribe stockbrokers to use money belonging to the brokers' clients to purchase KAUFMANN's shares and refrain from selling the shares for a one-year period. As described below, in exchange the defendants agreed to pay kickbacks of 26 to 28 percent of the total purchase price of the shares.

10. The UC purported to be a middleman who would pass on the bribes to a network of corrupt stockbrokers in the United States.

---

[1] Throughout this affidavit, the UC is referred to as "he." The use of this pronoun does not necessarily indicate that the UC is male.

As described below, he has explained to the defendants that the stockbrokers they are bribing have discretionary authority over the money entrusted to them, meaning that they can use it to purchase and sell securities without checking with the client first.  This allows the defendants to obtain substantial amounts of cash for the shares, because the UC and the defendants have agreed in advance on the per share price that the brokers will pay.  This price is set without regard for the actual value of the underlying company.  As described below, the defendants were specifically aware that the brokers would not tell their clients about these payments, and indeed specifically agreed to help conceal them.

   11.  The UC and NEUHAUS made contact in December 2010, and during the ensuing year, NEUHAUS repeatedly suggested companies in which he or his acquaintances owned stock that might be candidates for a stock bribery scheme.  NEUHAUS and the UC would discuss the possibility of carrying out such schemes, and in one instance in 2011, carried out such a scheme with respect to the stock of a company other than Axius.  On May 3, 2011, the UC and NEUHAUS were discussing that particular scheme by telephone.  NEUHAUS commented that "when it comes to pay out any commission, ah, the--you know officially to pay commission is illegal in all the countries."[2]

---

[2] In their conversations with the UC, NEUHAUS and KAUFMANN referred to the bribes to be paid to the UC as "commissions."  I believe they did this to avoid arousing suspicion in light of the illicit nature of their conduct.  Based on my training and experience, payments of 26 to 28 percent of the purchase price in a stock

12. Discussions of bribery and manipulation in the stock of Axius began in January 2012.[3] On January 26, the UC spoke to NEUHAUS by telephone. NEUHAUS explained that he had "a deal with a friend now" to sell stock in Axius; NEUHAUS would later reveal that the friend in question was KAUFMANN. NEUHAUS also stated that KAUFMANN owned all of Axius's shares, except for a small percentage of the total shares outstanding that was owned by another "friend" of NEUHAUS's.[4] KAUFMANN's control of these shares was an important element of the scheme. The defendants understood that the UC's brokers would be entering buy orders on the Over the Counter Bulletin Board, in which buyers and sellers do not trade directly with each other, but instead enter bids to buy and offers to sell at hypothetical prices. Only when a bid price and an offer price matched would a trade be executed. By effectively controlling all Axius shares, the defendants were able to ensure that when one of the UC's brokers entered a bid, only KAUFMANN would make money off the transaction, because no third-party seller would offer to sell at the same price, or "hit the bid." Control of the shares also

---

transaction are far greater than legitimate commissions in the securities industry. Moreover, I believe that the agreement not to disclose these payments to the brokers' clients makes clear that these "commissions" were in fact bribes.

[3] Unless otherwise noted, all dates identified in the remainder of this affidavit took place in 2012.

[4] According to SEC filings, KAUFMANN owns a large number of Axius shares, while other individuals and entities with connections to KAUFMANN own other shares. I believe that KAUFMANN effectively controlled all the shares of Axius.

enabled the defendants to ensure that the share price would not fall, because no third party could put downward pressure on the price by selling at a lower price.

13. On the January 26 call, NEUHAUS outlined a structure similar to the one they had previously discussed, in which KAUFMANN would sell shares to one or more of the UC's brokers, and the UC would receive a payment in return. NEUHAUS also made clear that KAUFMANN was actively interested in pushing the transaction forward, stating:

> JPN: And he's the only one who has shares. It's only 10 million outstanding. And, ah, he has about one and a half million free trading. The rest is still restricted.
>
> UC: OK.
>
> JPN: And we are looking to place, like, what is you doing, that we place a block, you take then your commission, and then, he's building up the company. He will put then some real estate—state, which he has in Dubai, also in the company, in the holding that it's, ah, more assets in it, you know, that it's, that it's like, ah, yeah, it looks stronger, the balance sheet, then. And I told him about you, and he proposed me that we can meet.

14. NEUHAUS stated that KAUFMANN wanted the transaction to start in February or March. NEUHAUS initially suggested that they meet abroad, saying, "I am not so comfortable in the States because in '98 I was a witness in a stock thing."[5] He eventually agreed,

---

[5] On January 21, 2000, NEUHAUS was ordered to pay $565,031 as a relief defendant in SEC v. Cavanagh, 98 Civ. 1818 (DLC) (S.D.N.Y.).

however, that the meeting would take place in the United States. NEUHAUS further stated that KAUFMANN wished to raise $4.5 to $5 million, of which 28 percent would be used to pay the UC.

15.  NEUHAUS raised another important element of the scheme: that the brokers refrain from selling the shares they had purchased. This is a form of stock price manipulation.  In seeking the UC's agreement that the brokers not sell their shares, the defendants sought to assure themselves that they would continue to control all the shares publicly available to trade, and that no third-party sellers would put downward pressure on the price of the shares that KAUFMANN continued to own.  Of course, by bribing the brokers to refrain from selling, even if a sale would be in the clients' best interests, the defendants were inducing the brokers to violate their duties to their clients.  Despite this, NEUHAUS made clear that it was an essential element of the scheme.  Referring to KAUFMANN, NEUHAUS stated: "I told him, it's not cheap, but the stock will not fly in your head.  This we have to guarantee him."  NEUHAUS requested assurance that the brokers could not even sell Axius stock for tax reasons at the end of the year.  The UC assured NEUHAUS, "No, no, no, they will never sell the stock for tax reasons--for any reason--unless I give them the go-ahead," adding, "Listen, you will not--that stock will not see the market unless you and he tell me to release it, I mean, the fee you're paying is so it stays there,

and that's my guarantee to you, it stays there unless you want it to leave." NEUHAUS repeatedly responded, "OK."

16. On February 3, the UC spoke to NEUHAUS by telephone. Referring to KAUFMANN, NEUHAUS reiterated, "For me and for him, it's very important, and I told him already, once you are buying with your people the stock, and the free trading stock, it will not be sold in our face." The UC assured him that it would not be. NEUHAUS also clarified that he would receive from KAUFMANN his own fee for arranging the Axius transaction. The participants then discussed an initial transaction to iron out the logistics of the stock sales. The UC suggested that this initial transaction would be for approximately $20,000. The UC and NEUHAUS reiterated their long-term plan for the company to raise $4.5-5 million gradually over the next two to three months. NEUHAUS also promised that the company would put out news releases during this period to support the stock sales.

17. On February 8, the UC, NEUHAUS, and KAUFMANN participated in a three-way conference call.[6] KAUFMANN emphasized his control over the outstanding shares and the importance of the brokers' refraining from selling the stock they would be purchasing. He stated, "I'm looking to do, to do what I call an 'all or nothing,'" adding that the shares were "100% under my umbrella," and that he

---

[6] On this call, KAUFMANN mentioned that he was in a foreign country.

-9-

wanted to "do it the right way, and make sure that everyone is in a comfortable position, and no third party coming in to, to, to hit the position." Later, he added, "But I don't want the shares to come out. I want to say, lock them up at least, have bona fide shareholders, say, till the next twelve months, I don't worry." The UC agreed, "For sure, we will hold the stock for a twelve-month period of time." The UC outlined the buying program that he and NEUHAUS had discussed: $4.5-5 million of purchases over a three-month period. KAUFMANN responded, "Perfect. Perfect. For me that's perfect." The participants discussed a share price of $3.50 per share, the same price at which Axius stock had traded most recently in its very limited trading history. I believe that in fact, the price of that previous trade had also been set by NEUHAUS and KAUFMANN; in a statement highlighting the extent of KAUFMANN's control over Axius's stock, KAUFMANN stated: "Right now, when I have somebody buy stock, there's, there's 20,000 shares that Jean-Pierre gave to a friend of his, and all I do is the following. I put an order into 20,000, and the other people take it, and then it's delivered." The most recent trade at that point was a trade for 20,000 shares on January 3 for $3.50.

18. KAUFMANN suggested a "test to see if the back office works," and added that once that test transaction was completed, NEUHAUS and he would come to New York to meet with the UC in person

and discuss further opportunities.  When NEUHAUS suggested that they could discuss further United Arab Emirates opportunities, the UC expressed interest in such opportunities, and KAUFMANN expressed reluctance to discuss them over the telephone, stating, "That's an easy one, but that we don't talk about."  When the UC agreed those matters should only be discussed in person, KAUFMANN stated, "Exactly."  The UC also offered to lower his fee to 26 percent from 28 percent, noting his hope that his business relationship with KAUFMANN and NEUHAUS would progress.  KAUFMANN agreed.  KAUFMANN also stated, "The only way I can do things, is, is I control everything.  I don't control it, I can't do it," adding, "I couldn't do this when I was forty years old, I didn't have the knowledge."

19.  The UC brought up "one last thing" to be discussed "once and only once, and we won't even come back to this."  The UC stated, "The main thing is, you know, these are big discretionary accounts, the customers, they don't--they can't know, they don't know, they won't know, about the 26 points, and that's the way we need to keep it."  KAUFMANN responded, "Done," and NEUHAUS added, "Yes."  KAUFMANN added, "Because don't forget, it's not expensed in the company."  The participants agreed to meet in person in New York during the first week in March.

20.  On February 16, the UC, KAUFMANN, and NEUHAUS again spoke in a three-way conference call.  They agreed to engage in a

-11-

transaction later that day in which KAUFMANN would sell 7,000 shares for $3.50 per share, for a total sale price of $24,500, with one of the UC's brokers purchasing the same number of shares at the same price. On this call KAUFMANN, NEUHAUS, and the UC also made tentative plans to execute a similar transaction the following day, February 17. The UC reiterated that he was willing to do the transaction for a lower payment of 26 percent, of which he would keep 5 percent, transferring the remainder to the brokers. NEUHAUS stated that the lower 26 percent payment should apply to the larger trades to be executed later, and that the UC take 28 percent on the initial, smaller trades. The participants agreed to this proposal. KAUFMANN expressed his appreciation for the lower fee of 26 percent, reiterating, "As I say, when I see you, you'll make, um, ah, much more on certain things that we are doing, that we want to do, and which I can propose." Finally, the UC again reiterated the need for secrecy during the following exchange:

> UC: These--as I had mentioned--these are discretionary accounts. These brokers are--these customers are not going to cause us any problems. They don't even know they're taking a position in these stocks, OK? But in the event this DTC-eligible situation, physical delivery causes us a hickup, something's slow, brings some attention to the account, the broker was just concerned, he just wants to make sure that, you know, there's an investor relations number, or any number for the company Axius, if the customer did

>           call--
>
> RK:       Yeah, it's no problem.
>
> UC:       He just wants to make sure that nobody is
>           ever going to reveal that 21 points [21
>           percent] is being paid to the broker on
>           this, and that--[7]
>
> RK:       No, don't, don't, don't worry about it,
>           you're 100 percent correct, because that's
>           why I'm doing it the way I'm doing it.  I
>           mean even on the--100 percent--I
>           understand 1,000 percent what you're
>           saying.  That's not to worry about.
>
> UC:       Oh.
>
> RK:       [Unintelligible] I mean, even on the web
>           sheet, on the web page of the company, all
>           the SEC filings, and all the business
>           lines, and with filings with DTC, the
>           agreement that we have is a three-way
>           agreement.  The paymaster is, is, um, uh,
>           Jean-Pierre [Neuhaus], um, and I'm the
>           principal, the other side, the principal.
>           I do not want to know who the brokers are,
>           Jean-Pierre doesn't want to know anything
>           except to be the paymaster, and to make
>           sure that he does his job that he has to
>           do, and that I have to do the following to
>           make sure the supply is there, and the
>           company grows and works the right way.
>
> UC:       OK, and, and my job will be that the broker
>           will never know you, and you will never
>           know the broker, so we are all happy.
>
> RK:       Exactly, it's a matter of trust.  And,
>           and, and that's what I like because,
>           that's, in a controlled environment, uh,
>           uh, it's the trust that you have to give
>           to the people.  Less words in this

---

[7] The UC mentioned 21 percent of the price going to the broker because he was anticipating that, as he had discussed previously with NEUHAUS, he personally would retain 5 percentage points of the total 26 percent payment.

>                business are the best, are the best things.
>
> UC:    I absolutely, absolutely agree with that,
>        and that's why I'm very excited and very
>        comfortable about going forward here.

21.    On certain of the calls with the UC, NEUHAUS and KAUFMANN have each expressed their beliefs that in fact, Axius had strong growth prospects, citing the potential of a cosmetics subsidiary that Axius owns, and discussing the possibility of diversifying the company into other fields such as health care.  NEUHAUS and KAUFMANN predicted that the company would pay dividends to its shareholders, and that the share price would increase in value.  There is reason to doubt the good faith of these claims.  As described above, Axius lost more than $600,000 last year, and its auditors expressed concern that it might go bankrupt.  It also appears that there are very few investors interested in purchasing Axius stock--before the purchases arranged with the UC, there had only been sales of Axius stock on two days out of the previous five months.  In any event, I believe the defendants' actions--bribing brokers to buy Axius stock at a pre-determined price using client money, obtaining the brokers' agreement to refrain from selling the stock for a twelve-month period, and agreeing to keep the payments to the brokers secret--constitute illegal bribery regardless of the underlying company's health.

22.    The first transaction was carried out on February 16, 2012.

The UC purchased 7,000 shares of Axius stock at $3.50 per share, for a total of $24,500. This was the first time in more than a month that there had been any trading in Axius stock.

23. The UC then sent wire instructions to enable NEUHAUS and KAUFMANN to pay him and the brokers his fee. NEUHAUS forwarded the instructions to KAUFMANN, reminding him that the payment would be 28 percent for the initial transactions and 26 percent for the later ones. At NEUHAUS's request, the UC then furnished the bank's address, which is in the Eastern District of New York. On February 19, KAUFMANN replied in an email message, stating, "I am instructing bank to wire as per our agreement early this week."

24. On February 17, the UC again purchased 7,000 shares of Axius at $3.50.

25. On February 27, the UC received the promised payment by wire from KAUFMANN: $13,700.

## Conclusion

WHEREFORE, your deponent respectfully requests that warrants be issued for the arrest of the defendants JEAN-PIERRE NEUHAUS and ROLAND KAUFMANN, so that they may be dealt with according to law. Your deponent also requests that this affidavit and the arrest

warrant for the defendant be sealed, except that the FBI may disclose this affidavit and the arrest warrant as necessary to effectuate the arrest and arraignment of the defendant.

_____
THOMAS McGUIRE
Special Agent
Federal Bureau of Investigation

Sworn to before me this
8th day of March, 2012

_____
HONORABLE ROBERT LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK